UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANTONIO D. WEBSTER,

                Petitioner,

v.

ERICA HUSS,

                Respondent.
_____/

Case No. 2:18-cv-12703

Paul D. Borman
United States District Judge

## OPINION AND ORDER (1) DENYING PETITION FOR WRIT OF HABEAS CORPUS, (2) DENYING CERTIFICATE OF APPEALABILITY, AND (3) DENYING PERMISSION TO APPEAL IN FORMA PAUPERIS

This is a habeas case filed by a Michigan prisoner under 28 U.S.C. § 2254. Petitioner Antonio D. Webster was convicted after a jury trial held in the Wayne Circuit Court of first-degree murder, Mich Comp. L. § 750.316, second-degree murder, Mich. Comp. L. § 750.317, and armed robbery, Mich. Comp. L. § 750.529. He was sentenced to life imprisonment for the first-degree murder conviction, his second-degree murder conviction was vacated, and he was sentenced to twenty-five to sixty years for the armed robbery conviction.

The petition raised three claims: (1) insufficient evidence was presented at trial to sustain Petitioner's convictions, (2) the trial court failed to grant Petitioner a sufficient adjournment after the prosecutor's untimely disclosure of evidence, and (3) the trial court erred in instructing the jury on evidence of flight.

The Court denies the petition because the claims lack merit. The Court also

denies Petitioner a certificate of appealability, and it denies permission to appeal in forma pauperis.

## I. Background

This Court recites verbatim the relevant facts relied upon by the Michigan Court of Appeals, which are presumed correct on habeas review pursuant to 28 U.S.C. § 2254(e)(1). See *Wagner v. Smith*, 581 F.3d 410, 413 (6th Cir. 2009):

> This case arises from the April 19, 2015 robbery and murder of Henry Perry. The bulk of the narrative concerning the events surrounding Perry's death was provided by a fifth accomplice, Ashley Thompson, who was dating Fields in April 2015 and maintained a platonic relationship with Perry. At trial, Thompson testified that Fields and Webster devised a plan to rob Perry after Fields learned of her secret friendship with Perry on April 18, 2015. On April 19, Fields and Webster included McCloud in discussions concerning the planned robbery and Fields indicated that Perry "had to go," which Thompson construed as meaning Perry had to die.
>
> Around 3:30 p.m. on April 19, Thompson lured Perry to the intersection of Longacre and Wadsworth in Detroit by turning the engine of her Jeep off, activating her hazard lights, and calling Perry to ask for help with her malfunctioning vehicle. While Perry was examining the Jeep's engine compartment, Webster and McCloud arrived in a burgundy Impala driven by Brown. According to Thompson, Webster pointed a gun at Perry and told him not to move. As she was driving away from the standoff, she heard two gunshots and observed that Perry was not standing anymore. In her rearview mirror, she saw McCloud take Perry's shorts off before getting inside Perry's truck. A few minutes later, Fields called and directed her to pick McCloud up at an intersection approximately two streets from the scene. Thompson complied and, after locating McCloud, observed him removing a cell phone and wallet from Perry's shorts.

2

Thompson returned to her house on Meyers Street with McCloud, where she saw Brown and Fields in the Impala, parked in her driveway. Once inside the house, Fields, Brown, and McCloud split Perry's money, Fields took Perry's cell phone, and they agreed to dispose of the Impala. About 30 minutes later, they left the house—Brown and McCloud in the Impala and Thompson and Fields in her Jeep. Fields directed her to the eastside of Detroit, where Brown, McCloud, and Webster were waiting. Shortly after abandoning the Impala, Thompson and defendants were pulled over due to improper license plates on Thompson's Jeep. McCloud was arrested on an outstanding warrant, but Thompson, Fields, Brown, and Webster were permitted to leave without incident. When McCloud was searched at the Detroit Detention Center, Perry's identification and credit card were discovered in his pant leg.

In the early morning hours of April 20, 2015, Thompson, Fields, and Webster drove to the house Webster shared with his girlfriend, Dionne Williams–Mitchell. Williams–Mitchell testified that Thompson, Fields, and Webster discussed the April 19 robbery and murder. Williams–Mitchell also testified that Brown drove a red or burgundy Impala for a period of time in April 2015, which Webster had stolen from a woman he met at the liquor store.

The prosecution also presented cell phone records tending to implicate defendants in Perry's death. Testifying as an expert in forensic analysis of cell phone call detail records, Stan Brue presented a chart depicting the phone calls between the four defendants and Thompson between 3:40 p.m. and 4:00 p.m., i.e., the period shortly before and after the 3:52 p.m. 911 call reporting the shooting, along with a map depicting the cellular sites and sectors utilized for most of the calls. According to Brue, the sites and sectors used in the periods before and after the shooting were consistent with use at or near the crime scene. Detective David Boike, an expert in computer and cell phone forensics, extracted potentially incriminating data from cell phones belonging to Fields, Webster, and McCloud. Between April 19 and April 22, 2015, Webster's cell phone contained internet search queries regarding Detroit crimes and how to remove OnStar from a 2007 Impala. There were also a number of visits to local news websites with headings including, "a man shot and killed on Detroit's west side," "fatal shooting," and "police search for trio

3

suspect after fatal shooting and robbery." Fields's cell phone reflected a similar internet search history concerning recent shootings in Detroit.

*People v. Webster*, 2017 WL 6346194, at *1–2 (Mich. Ct. App. Dec. 12, 2017).

Following his conviction and sentence, Petitioner filed a claim of appeal in the Michigan Court of Appeals. His brief on appeal raised three claims:

> I. Were defendant's due process rights violated when he was convicted of felony murder predicated on an aiding and abetting theory of armed robbery without sufficient evidence to prove those offenses beyond a reasonable doubt?
>
> II. Was defendant denied due process when being denied a sufficient adjournment when the prosecution provided late discovery of 2800 pages of material after the jury selection and when the prosecution was allowed to add a witness once the trial process began?
>
> III. Did the trial court deprive defendant of his right to be judged by a properly instructed jury when it improperly delivered a flight instruction when flight was not an issue?

The Michigan Court of Appeals affirmed Petitioner's convictions in an unpublished opinion. *Id*. Petitioner then filed an application for leave to appeal in the Michigan Supreme Court that raised the same three claims. The Michigan Supreme Court denied the application because it was not persuaded that the questions presented should be reviewed. *People v. Webster*, 913 N.W.2d 655 (Mich. 2018) (Table).

## II. Standard of Review

28 U.S.C. § 2254(d)(1) curtails a federal court's review of constitutional claims

raised by a state prisoner in a habeas action if the claims were adjudicated on the merits by the state courts. Relief is barred under this section unless the state court adjudication was "contrary to" or resulted in an "unreasonable application of" clearly established Supreme Court law.

"A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15–16 (2003) (per curiam), quoting *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000).

"[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003), quoting *Williams*, 529 U.S. at 413.

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011), quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004).

> "Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal. . . . As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."

*Richter*, 562 U.S. at 102–03 (internal quotation omitted).

### III. Analysis

A. Sufficiency of the Evidence

Petitioner first claims that constitutionally insufficient evidence was presented at trial to sustain his first-degree felony murder conviction because there was an absence of evidence indicating that he committed armed robbery, the predicate felony. After reciting the controlling constitutional standard and the elements of armed robbery, the Michigan Court of Appeals rejected the claim on the merits:

> In challenging the sufficiency of the evidence presented against him, Webster argues on appeal that there was insufficient evidence that he aided and abetted the commission of armed robbery because there was no evidence that he deprived another person of property or shared in the proceeds of the larceny committed by McCloud and Brown. He further reasons that because armed robbery served as the predicate offense for his felony-murder conviction, both of his convictions should be reversed. We disagree. Viewing the evidence in the light most favorable to the prosecution, it is evident that the prosecution presented sufficient evidence from which the jury could find beyond a reasonable doubt that Webster was guilty of armed robbery, even without relying on an aiding and abetting theory.

6

> \* \* \*
>
> Thompson testified that when Fields described his plan to rob Perry, Webster said, "Okay," though he did not comment when Fields later said that Perry "had to go." Thus, the jury could infer that, at minimum, Webster was in agreement with Fields's robbery scheme and intended to participate in it. Webster then carried out his role by pointing a gun at Perry, telling him not to move, and shooting him. In doing so, Webster clearly committed an unlawful act that placed Perry in reasonable apprehension of an immediate battery—in other words, an assault—using a dangerous weapon as required by MCL 750.529. Finally, with respect to the requirement that these actions occur in the course of committing a larceny, Thomas testified on cross-examination that the shooter took something from Perry's vehicle before running from the scene. If the jury found Thomas's testimony credible, this would be sufficient evidence that Webster completed the larcenous taking of Perry's property. Even if the jury credited Thompson's testimony identifying McCloud, rather than Webster, as the
> person who entered Perry's vehicle after the shooting, there was still sufficient evidence regarding this element because Webster could be convicted of armed robbery even if the larcenous taking was not completed. Given the evidence of Webster's earlier assent to Fields's robbery plan and subsequent participation in carrying it out, a rational jury could find him guilty of armed robbery beyond a reasonable doubt.

*Webster*, 2017 WL 6346194, at \*11–12.

The question when reviewing the sufficiency of the evidence to sustain a conviction is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citation omitted) (emphasis in the original). Sufficiency of the evidence claims raised on federal habeas review "are subject to two layers of judicial deference." *Coleman*

7

*v. Johnson*, 566 U.S. 650, 651 (2012). First, "'[A] reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury.'" *Id.* (quoting *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (per curiam)). Second, a federal court may only "overturn a state court decision rejecting a sufficiency of the evidence challenge . . . if the state court decision was 'objectively unreasonable.'" *Id.* (citing *Cavazos*, 565 U.S. at 2). For a federal habeas court reviewing a state court conviction, the only question under *Jackson* is whether the state court's decision that sufficient evidence was presented was "so insupportable as to fall below the threshold of bare rationality." *Coleman*, 566 U.S. at 656.

Here, the Michigan Court of Appeals did not unreasonably reject Petitioner's sufficiency of evidence claim. If the jury credited Ashley Thompson's testimony as true, that testimony by itself established that Petitioner agreed to the robbery scheme. Another witness, Floria Thomas, testified that she saw Petitioner fire his weapon into the victim's vehicle and then reach his arm inside, suggesting that he attempted to take something from the victim's body. Petitioner's challenge to the credibility of these two accounts simply does not speak to the constitutional sufficiency of the evidence. *See, e.g.*, *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009) (reviewing court may not "reweigh the evidence, reevaluate the credibility of witnesses, or substitute [its] judgment for that of the jury."). The findings by the Michigan Court of Appeal were

therefore neither "objectively unreasonable" nor "insupportable." *Coleman*, 566 U.S. at 651, 656. Petitioner's first claim is without merit.

B. Failure to Grant Adjournment

Petitioner's second claim asserts that the trial court erred when it did not grant a sufficient adjournment for his counsel to review 2,800 pages of documents that were turned over by the prosecution after jury selection. Petitioner also asserts that the trial court erred in allowing prosecution witness Cynthia Fain to testify when she was not endorsed as a witness until after jury selection had already commenced.

With respect to the late production of documents, the Michigan Court of Appeal found that review of the claim was barred by his counsel's agreement to the adjournment granted by the trial court:

> Webster takes issue with the length of the adjournment granted by the trial court after the prosecution produced 2,800 pages of discovery on March 19, 2016, when opening statements were scheduled for March 21, 2016. However, the record reflects that after objecting to an earlier one-day adjournment granted on March 21, 2016, the parties all agreed on March 22, 2016, that they would be prepared to proceed with opening statements after an additional two-day adjournment. By agreeing that the second adjournment would provide an adequate time to review the newly produced discovery materials, Webster intentionally relinquished a known right, thereby waiving any error arising from the trial court's ruling.

*Webster*, 2017 WL 6346194, at *12 (footnote omitted).

As the state appellate court correctly found, Petitioner's counsel waived this

claim when he and the prosecutor agreed to a two-day adjournment. Tr. 3/22/16, at 46–47. The claim is therefore barred from review here, and Petitioner has failed to assert any reason for the Court to look past this grounds for decision. *See, e.g.*, *Shahideh v. McKee*, 488 F. App'x 963, 965 (6th Cir. 2012) ("[W]aiver is a recognized, independent and adequate state law ground for refusing to review alleged trial errors.").

With respect to the late endorsement of Fain, the Michigan Court of Appeals found that the prosecutor did not act in bad faith and Petitioner was not prejudiced:

> The second basis for Webster's claim of error relates to the late endorsement of Cynthia Fain as a witness for the prosecution. On March 16, 2016, the third day of jury selection, the prosecution moved to amend its witness list to include Fain. Pursuant to MCL 767.40a(4), with the court's leave, the prosecution may add or delete a witness from its list of trial witness upon a showing of good cause. The prosecution acknowledged that it had been aware for some time that Fain had reported her burgundy Impala stolen the day before the murder. However, because she had been moving between different homeless shelters, the prosecution was unable to locate and interview her until March 15, 2016. The prosecution's investigator testified that he began looking for Fain in November 2015, checking addresses and phone numbers she provided to the police when reporting her Impala stolen. He also followed up at prior addresses associated with Fain in other police and state records, including two or three homeless shelters. The investigator left phone messages with several friends and family members and eventually received a return call from a gentleman who provided a new cell phone number for Fain and agreed to give her the investigator's message. When the investigator finally got in touch with Fain, she agreed to meet with the prosecution for an interview. The interview was conducted on March 15, 2016, at which point the prosecution first learned that Fain had an intimate relationship with

>Webster before the theft and could therefore identify him as the person who stole her Impala.
>
>Under these circumstances, the trial court did not abuse its discretion by finding that the prosecution had demonstrated good cause to add Fain as a witness. The prosecution's investigator made substantial efforts to locate Fain in advance of trial but was unsuccessful owing in large part to Fain's transient housing circumstances. Although the prosecution suspected that Fain was the owner of the Impala used in the April 19 incident based on the timing of the theft, the significance of Fain's availability as a witness lay in her ability to identify Webster as the person who stole her vehicle. At the time the prosecution filed its witness list, it had no reason to believe that Fain would be able to confidently link any defendant to the Impala because Fain did not disclose that she knew the thief when she reported the incident to the police.
>
>Moreover, the court's ruling did not unfairly prejudice Webster. Because Webster's former relations with Fain were known to him, her testimony should not have come as a surprise. Additionally, when the trial court ruled that the prosecution could add Fain to its witness list, it also appointed an investigator to conduct a second interview on Webster's behalf, thereby ensuring that Webster's attorney was prepared to cross-examine Fain when she testified over two weeks later.

*Webster*, 2017 WL 6346194, at *12–13 (footnotes omitted).

Whether evidence is properly admitted under state law plays "no part of the federal court's habeas review of a state conviction [because] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991). Accordingly, "[a] decision regarding the endorsement of a witness generally constitutes a state law matter within the trial court's discretion." *Warlick v. Romanowski*, 367 F. App'x 634, 643 (6th Cir.

2010). The court may only grant relief on such grounds if the habeas petitioner is able to show that the state court's evidentiary ruling was in conflict with a decision reached by the Supreme Court on a question of law or if the state court decided the evidentiary issue differently than the Supreme Court did on a set of materially indistinguishable facts. *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000).

Petitioner has not met this difficult standard. Though the prosecutor was aware of Fain's identity well before trial, the police could not locate or interview her. Until they spoke with her they could not know that she would identify Petitioner as the person who stole her car. When the authorities finally located Fain and learned of her value to the prosecution, she was immediately added to the witness list. While such a mid-trial addition might normally cause the potential for prejudice, the trial court afforded Petitioner an opportunity to interview Fain for a period of about two weeks before she was scheduled to testify. Under these circumstances, the decision to let Fain testify was not fundamentally unfair, and no Supreme Court case compelled the state court to decide the claim differently. Accordingly, Petitioner has failed to demonstrate entitlement to relief on this claim.

C. Jury Instructions

Finally, Petitioner's third claim asserts that the jury was erroneously instructed on evidence of flight despite no evidence being admitted at trial suggesting that

Petitioner fled from the crime scene. The Michigan Court of Appeals found that the evidence warranted the instruction:

> Defendants correctly observe that their interactions with the police in connection with this case—during the April 19 traffic stop and at the time of their respective arrests—were generally described as cooperative and that the prosecution did not present evidence to suggest that they fled the scene as a result of active pursuit. However, it does not follow, as defendants argue, that the jury could not infer that their departure evinced consciousness of guilt. In addition to Thompson's recollection of the April 19 robbery and murder, the prosecution also presented testimony from Floria Thomas, an unrelated third-party who witnessed the incident. According to Thomas, three African-American men were involved in the shooting and, after the perpetrators shot Perry and removed his shorts, two of the perpetrators sped away from the scene in the Impala, while the third perpetrator fled the scene on foot. Thompson likewise indicated that McCloud was left behind and that she had to return to the area to pick him up. The jury could infer from the hasty retreat of those defendants who departed in the Impala, and their refusal to return when it became apparent that McCloud was left without a quick avenue of escape, that defendants left the scene in order to elude detection, and not simply because they had completed their mission. Thus, the trial court did not abuse its discretion by properly instructing the jury that it should determine whether the circumstances of defendants' departure were indicative of a guilty state of mind.

*Webster*, 2017 WL 6346194, at *4 (footnotes omitted).

When a federal habeas petitioner challenges a jury instruction given at his trial, he must show that the challenged instruction so infected the entire trial that the resulting conviction violates due process, not merely whether the instruction is undesirable, erroneous, or even "universally condemned." *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977). Petitioner must also show that the challenged instruction had

a substantial and injurious effect or influence on the jury's verdict. *Hedgpeth v. Pulido*, 555 U.S. 57, 61–62 (2008).

The flight instruction at Petitioner's trial did not render his trial unfair, nor did it have an injurious impact on the jury's verdict. Under Michigan law, flight is relevant to prove a defendant's consciousness of guilt. *Johnson v. Burke*, 903 F.2d 1056, 1062 (6th Cir. 1990) (internal citations omitted). Thus, the giving of a flight instruction properly instructed the jury on an issue raised by Floria Thomas' testimony that the perpetrators of the crime fled the scene. The instruction did not direct the jury to find that Petitioner fled the scene. Rather, it directed jurors to make their own determination as to whether Petitioner did, in fact, attempt to flee the scene and if so, what state of mind such flight evinced. *See Burton v. Renico*, 391 F.3d 764, 778 (6th Cir. 2004); *see also United States v. Carter*, 236 F.3d 777, 792 n. 11 (6th Cir. 2001).

Because all of Petitioner's claims are without merit, the petition is denied.

### IV. Certificate of Appealability

Federal Rule of Appellate Procedure 22 provides that an appeal may not proceed unless a certificate of appealability issues. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Courts must either issue a certificate of appealability indicating which issues satisfy the required showing or provide reasons

why such a certificate should not issue. 28 U.S.C. § 2253(c)(3); Fed. R. App. P. 22(b); *In re Certificates of Appealability*, 106 F.3d 1306, 1307 (6th Cir. 1997).

To receive a certificate of appealability, "a petitioner must show that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (internal quotes and citations omitted). Here, jurists of reason would not debate the Court's conclusion that Petitioner has not met the standard for a certificate of appealability because his claims are devoid of merit. Therefore, the Court denies a certificate of appealability.

If Petitioner appeals the Court's decision, leave to proceed in forma pauperis is denied because an appeal could not be taken in good faith. 28 U.S.C. § 1915(a)(3).

## V. Conclusion

Accordingly, the Court 1) DENIES WITH PREJUDICE the petition for a writ of habeas corpus, 2) DENIES a certificate of appealability, and 3) DENIES permission to appeal in forma pauperis.

SO ORDERED.

Dated: February 11, 2020  s/Paul D. Borman
Paul D. Borman
United States District Judge